CLAMON W. SANDERS, Administrator of the Estate of FRANKLIN BLAINE SANDERS v. MARY GRAY POLK.

(Filed 28 April, 1965.)

**Automobiles § 41l—**

Evidence tending to show that an hour to an hour and a half prior to the incident in question intestate was seen in a normal condition some three hundred yards away from the scene, that intestate was 35 years old and in good health, and that intestate was lying prostrate on the highway in defendant's lane of travel when his body was run over by the car driven by defendant, *held* insufficient to be submitted to the jury in an action for wrongful death, since the evidence leaves in mere conjecture whether intestate was alive at the time he was struck by defendant's car.

APPEAL by defendant from *Brock, Special Judge,* September 1964 Civil Session of ANSON.

Wrongful death action.

Plaintiff alleged his intestate, Franklin Blaine Sanders, Jr., on June 1, 1963, at approximately 1:30 a.m., was lying prostrate on the eastern side of the public road in Anson County, North Carolina, commonly known as the "Upper White Store Road"; and that defendant, while proceeding in a northerly direction along the eastern (defendant's right) side of said road, carelessly and negligently "ran her automobile into, on and over" Sanders, dragged him "for a distance of approximately 500 feet underneath her car," and thereby caused his death.

Answering, defendant denied all of plaintiff's essential allegations.

The only evidence was that offered by plaintiff.

The court submitted, and the jury answered, two issues, *viz.*: "1. Was the plaintiff's intestate killed by the negligence of the defendant, as alleged in the Complaint? Answer: Yes. 2. What amount of damages, if any, is the plaintiff entitled to recover? Answer: $10,000.00."

Judgment for plaintiff, in accordance with said verdict, was entered. Defendant excepted and appealed.

*Taylor & McLendon and F. O'Neil Jones for plaintiff appellee.*
*Carpenter, Webb & Golding for defendant appellant.*

BOBBITT, J.   Defendant assigns as error the denial of her motion for judgment of nonsuit. She contends the evidence is insufficient to support a jury finding that negligence on the part of defendant caused her to run over the prostrate form of Sanders or that her conduct, negligent or otherwise, proximately caused Sanders' death. Relevant to proximate cause, defendant contends the evidence is insufficient to support a jury finding that Sanders was living when run over by defendant.

Early on Saturday, June 1, 1963, about 1:30 a.m., defendant, alone in her automobile, was driving along Upper White Store Road, a rural paved road, toward her home. The night was dark. The weather was clear. She was proceeding on the eastern (her right) side of said road. On a portion of said road within the town limits of Peachland, she ran over the prostrate form of Sanders.

Defendant stopped her car. Looking back, she saw the body she had run over. She did not get out of her car. First, she drove to the home of Mr. Hamilton, a rural policeman. Unable to locate him, she drove to the home of Mr. Dutton, a trooper of the State Highway Patrol. Mr. Dutton "got dressed" and proceeded in his patrol car to said portion of Upper White Store Road. Defendant, driving her own car, accompanied him. Shortly after their arrival, Mr. Leavitt, the Coroner of Anson County, came to the scene, "made enough examination of the body (of Sanders) at the scene to determine the fact that he was dead," and removed the body by ambulance to Wadesboro for a more thorough examination. Later, Sheriff Raefield, in response to a call, went to the scene. Before Raefield arrived, defendant, as directed by Dutton, had gone to her home. On Sunday afternoon, June 2, 1963, as requested by Dutton and Raefield, defendant drove her car to a service station in Peachland. It was "jacked up" on a grease rack for examination of the "under portion" of defendant's car. Following such examination, defendant went with Raefield to said portion of Upper White Store Road and there was questioned by Raefield.

We find no material discrepancies or inconsistencies in the evidence pertinent to whether Sanders was alive when run over by defendant. This evidence, in summary, is set out below.

Sanders, 35, was married. He lived with his wife and two children in Peachland. His health was good. He was a carpenter foreman and worked regularly. He had worked on Friday, May 31, 1963.

On June 1, 1963, between 12:00 midnight and 1:00 a.m., the witness Goodman and his brother were sitting on the front steps of the brother's home on Lower White Store Road. Sanders, walking and alone, came

up to the steps, stood there and talked with them a few minutes and then walked off. His condition was normal. In leaving, he did not say where he was going but he was headed "north towards town" in the direction of his home. Lower White Store Road joins Upper White Store Road about 300 yards from said Goodman house. When Sanders left, he was walking along Lower White Store Road toward its junction with Upper White Store Road. The point where the prostrate form of Sanders was lying on the eastern side of Upper White Store Road when run over by defendant's car is approximately 300 yards north of said junction of roads.

Plaintiff offered in evidence the adverse examination of defendant. The portion of her testimony pertinent to the question under consideration is set out below.

Defendant was a car-length away when she "saw an object that subsequently turned out to be Mr. Sanders." Sanders' body, motionless, was "lying crossways"—"straight across in (her) lane"—perpendicular to the center line(s) of the road. There was no movement of the body when she first saw it or thereafter. When approaching the point where the prostrate form of Sanders was lying, defendant saw the lights of another car, traveling in the same direction, a "good ways" ahead of her.

The portion of the testimony of Dutton pertinent to the question under consideration is set out below.

Upon his arrival at the scene, he found the body of Sanders "on the paved portion of the highway on the east, southeast side." He testified: "The head portion of the body (was) lying approximately the center of the highway, the feet and legs extended east, southeastward, the feet being approximately the edge of the pavement." He testified Sanders' clothing consisted "of a pair of . . . overalls, suspenders, apron front, . . . of a bluish material, had light pin stripes." The overalls were torn considerably, partially gone in places. He testified Sanders' "right leg ankle was completely in two except a particle of flesh on the inside." He testified: "At the time of my examination of the body of the deceased, I did not observe any movement. There was no moving at all. I did not test the body for temperature or warmth." Dutton examined defendant's car "that night." He testified: "I checked the front of the automobile in the area of the headlights, the front grille, and the radiator, underneath and the area of the front springs and axle, and I could not find any markings or any dents on the front of the car. I did not find any clothing materials or fibers of any kind at that time." At trial, Dutton testified defendant had made a statement to him about the lights of another car but could not recall whether she said the car was behind her or in front of her. Asked to refresh his recollection,

Dutton stated it was correct he had previously testified as follows: "She stated that a car was in front of her, that she could see lights of another car traveling north, being some distance in front of her, but was unable to say that the car was in the area of the body. She didn't see the car in this area at the time. The last time she saw these lights were approximately a half mile south of where the body was found, but this car, the lights, was traveling in the same direction she was traveling."

Raefield testified: "She (defendant) told me that it (body of Sanders) appeared to be lying face down. Lying face downward. She told me that she recognized it as a white man at about 20 feet before she made contact, that she thought it was a white person laying face downward." Raefield also testified that he "did not find any dents or marks of any kind around the front" of defendant's car.

It is noted that Dutton and Raefield testified that on Sunday afternoon, June 2, 1963, they did observe blood stains and some hair on "the under portion" of defendant's car.

The coroner testified that his further examination of the body in Wadesboro disclosed Sanders "had several skull fractures, his chest was pretty badly crushed, and he had compound fractures of the left forearm and wrist, and left shoulder, left hip and right ankle." He testified further: "He (Sanders) had, of course, various lacerations and bruises over his entire body."

The record shows the body of Sanders was examined by Dr. W. M. Summerville and that, upon Dr. Summerville's failure to appear "as scheduled," defendant stipulated "that the injuries Dr. Summerville found upon the body of the plaintiff's intestate were sufficient to and did cause the death of the plaintiff's intestate."

Decision requires the application of legal principles stated in *Lane v. Bryan*, 246 N.C. 108, 97 S.E. 2d 411, and cases cited therein, to the present factual situation.

All the evidence tends to show that, as defendant approached, Sanders was lying prostrate and motionless "crossways" the lane for northbound travel. The fact there were no dents or marks of any kind on the front of defendant's car tends to show the body of Sanders was lying flat and limp on the paved road. The evidence as to Sanders' work and health tends to dispel speculation that his presence and position on the highway might have been caused by some disabling seizure. If speculation were permissible, it would seem more likely that Sanders had been struck by one or more cars prior to defendant's arrival on the scene. There is positive evidence an (unidentified) car had preceded defendant in the lane for northbound travel.

In *Brownrigg v. Boston & Albany Railroad Co.*, 185 N.Y.S. 2d 977, where a train ran over a body on the track, the court said: ". . . in-

itially, there must be some proof that the body struck was that of a living person. For all that appears in the record before us, the deceased may have met death through some other means before the impact with the train. The presence of the body on the track, at the time and place the engine struck it, is completely unexplained."

Plaintiff contends continuity of life is presumed. He quotes from 16 Am. Jur., Death § 13, the following: "The law presumes that a person shown to be alive at a given time remains alive until the contrary is shown by some sufficient proof, or, in the absence of such proof, until a different presumption arises."

In Stansbury, North Carolina Evidence, § 237, the author states: "There is no genuine, uniform presumption of the continuance of a human life, and certainly no general presumption of continuity that may be relied upon with any reasonable assurance." In accord: 9 Wigmore on Evidence (Third Ed.), § 2531. Presently, we are not concerned with presumptions as to the continuity of life or as to death where a person's whereabouts are unknown and his protracted absence is unexplained.

Here, the evidence tends to show: Sanders, shortly after midnight, was walking along Upper White Store Road toward his home; that his condition was normal; that his health was good; and thereafter, as defendant's car approached, he was lying prostrate and motionless on the paved highway in the position described by defendant. These facts, in our opinion, are insufficient to raise a presumption that Sanders was alive when run over by defendant's car. Moreover, in the absence of such presumption, there is no evidence as to when Sanders was fatally injured. As stated in *Lane v. Bryan, supra:* "The evidence leaves it all in the realm of mere conjecture, surmise, and speculation, and one surmise may be as good as another. Nobody knows. A cause of action must be something more than a guess." It would be "the irony of fate" if defendant, as a consequence of her prompt report to and cooperation with the officers, should be held responsible for the conduct of one or more "hit and run" drivers.

After consideration of the evidence in the light most favorable to plaintiff, the conclusion reached is that the evidence was insufficient to support a jury finding that the conduct of defendant, negligent or otherwise, proximately caused the death of Sanders, and that defendant's motion for judgment of nonsuit should have been allowed. Decision on this ground renders unnecessary discussion of the very serious question as to whether there was evidence sufficient to support a jury finding that negligence on the part of defendant caused her to run over the prostrate form of Sanders.

For the reasons stated, the verdict and judgment are set aside, and the cause is remanded with direction that judgment of involuntary non-suit be entered.

Reversed.